UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CALAIS SHIPHOLDING CO.,

              Plaintiff,

- against -                                                                    ECF CASE

BRONWEN ENERGY TRADING LTD.

              Defendant.
-------------------------------------------------------------X

07 CV 10609

JUDGE LEISURE

## VERIFIED COMPLAINT

Plaintiff, CALAIS SHIPHOLDING CO. ("Plaintiff" or "Calais"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendants, BRONWEN ENERGY TRADING LTD. ("Defendant" or "Bronwen") alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*, and this Court's federal question jurisdiction, 28 United States Code § 1331.

    2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with an office c/o Capital Ship Management Corp. in Piraeus, Greece.

    3.    Upon information and belief, Defendant Bronwen was, and still is, a foreign corporation or other business entity organized and existing under foreign law with an address at St. George, Commonwealth of Dominica.

4. At all material times, Plaintiff was and is the Owner of the M/T "AMOR" ("Vessel" or "M/T AMOR").

5. By charter party contract dated July 13, 2007, Calais voyage chartered the Vessel to Bronwen.

6. The Charter Party provided for the loading of a cargo of "*1/2 GRADES GASOIL*" at "*1 SAFE STS LOME*" and for discharge at "*1 SP OR IN CHOPT SAFE STS LAGOS... OR CHOPT... HARCOURT... OR... CALABAR.*"

7. Pursuant to BPVoy3 clause 55, the Charter Party is governed by English law, and is subject to the jurisdiction of the High Court, but at Additional Clause 10, the Charter Party provides either party with an election in favor of London arbitration.

8. The Charter Party also provides in the "*WEST AFRICA CLAUSES*" that "*IF MORE THAN 7 DAYS UNDISPUTED DEMURRAGE INCURRED AT DISPORT CHARTERERS TO PAY SUCH DEMURRAGE CLAIM AGAINST OWNERS TELEX INVOICE/CALCULATION AND TO REPEAT THAT EVERY 7 DAYS*".

9. During the course of the charter party, disputes arose between Calais and Bronwen with regard to the sixth, seventh, eighth and ninth demurrage invoices issued by Calais to Bronwen in respect of demurrage totaling $559,650 and Calais notice of intent to exercise a lien over cargo on board the Vessel.

10. On October 11, 2007, the parties via their respective London solicitors agreed to escrow terms whereby Bronwen would provide security for Calais' claim for outstanding demurrage due whereupon Calais would refrain from exercising its lien on the cargo. It was further agreed in the parties' Escrow Agreement that the security would stand for satisfaction of a final, binding and unappealable award in an arbitration commenced in accordance with the

terms of the charter party contract or an unappealable judgment of the English courts in the event of an appeal from such an award.

11. On or about October 12, 2007, Bronwen paid the sum of $1,119,287.68 into the Escrow Account established pursuant to the Escrow Agreement. The Escrow Agreement provided that the further sum of $19,987.50 was to be paid into the Escrow Account from, and including, October 17, 2007 until discharge was complete at or off Lagos.

12. Discharge had not yet completed by October 17, 2007 and therefore further sums became due under the Escrow Agreement and on or about October 17, 2007 a further sum, $139,912.50, amounting to 7 days demurrage was paid directly to Calais by Bronwen on account of demurrage.

13. On or about October 23, 2007, the sum of $59,950.11 was received into the Escrow Account from "Bronwen Energy Trading."

14. On or about November 1, 2007, the sum of $59,913.89 was received into the Escrow Account from "Bronwen Energy Trading."

15. On or about November 5, 2007, the sum of $39,951.00 was received into the Escrow Account from "Arco Petrochemical Engineering Co Ltd." Nothing further has been received either directly by Calais or into the Escrow Account since that payment.

16. Discharge of cargo from the M/T "Amor" ultimately was completed on or about November 4, 2007. Accordingly, the sum of $379,762.50 (being 19 days at $19,987.50 per day) should have been paid into the Escrow Account by Bronwen in addition to the initial deposit. In fact only a further $159,802.32 has been received. Together with the payment made direct to Calais on account of demurrage this makes a total of $299,714.82, leaving a shortfall of $80,047.68.

17. Following receipt of discharge instructions and the agreement regarding the Escrow Account, the Vessel proceeded on or about October 13, 2007 to berth at Lister Jetty. Whilst at that berth, on October 14, 2007, the Vessel was passed by the "MSC ACCRA" at high speed and close to the Vessel. The Vessel's Master issued a letter of protest in relation to this incident.

18. This incident resulted in the after floating dolphin being pulled off its piles and falling into the water and three of the Vessel's ropes being broken. As a result of this, the Vessel then moved towards the midstream out of the jetty.

19. Despite having given instructions for the discharge of the full cargo at the Lister Jetty, Bronwen changed those orders to have just 6,000 metric tons of the cargo discharged there. Calais has reserved all its rights in respect of Bronwen's instructions.

20. On or about October 18, 2007, Bronwen indicated that arrangements were being made for the Vessel to move to the Ibafon jetty to discharge the balance of the cargo. Bronwen's agents had previously advised that that Jetty had a draft of 6.0 meters. Other information indicated that one of the berths at the jetty might be able to take vessels of up to 8 meters draft. Calais could not establish that this was a safe berth and in light of the information available as to the draft at the berth, and thus proceeded under protest as to the safety of the berth and reserved its rights.

21. During berthing, under the control of a Pilot, the Vessel grounded some 30 to 40 meters from the berth. It was proposed that discharge take place via a long hose and that this, together with a high tide, would re-float the Vessel.

22. The Master was not happy with the discharge arrangements and asked that sufficient barges be provided to hold the Vessel as safely as the circumstances would allow. The

4

requested barges were eventually provided early on November 2, 2007 and discharge commenced later that day. The extent of any damage from the grounding is due to be assessed shortly with an underwater inspection at anchorage.

23. Discharge at Ibafon finally completed on or about November 4, 2007.

24. Whilst at the Ibafon berth on November 9, 2007, the M/T "GLOBE SKY" collided with the Vessel. No serious damage is apparent to either vessel. The extent of any minor damage will be assessed in due course.

25. On November 2, 2007, pursuant to the terms of Additional Clause 10 of the Charter Party, Calais notified Bronwen that it had elected for all disputes arising under the charter party contract to be referred to London arbitration, and notified Bronwen that it had appointed its arbitrator and called for Bronwen to appoint its arbitrator.

26. On November 16, 2007 Walker & Co, solicitors for Bronwen, notified Calais of the appointment of its arbitrator, without prejudice to its position that the Nigerian court had seized jurisdiction over the disputes referred to arbitration and that Bronwen would challenge the jurisdiction of the arbitration tribunal.

27. No sooner had the Vessel completed discharging at the Lister Jetty on November 4, 2007, than the Vessel was served with arrest papers in the Lagos proceedings, all of which were dated October 22, 2007.

28. Bronwen's Statement of Claim purportedly indicates that it was issued on behalf of Bronwen Energy Trading Ltd of Nigeria ("Bronwen ETL Nigeria") by Lagos lawyers, AB Sulu-Gambari & Co., and the endorsement to the Writ of Summons indicates that Bronwen's claim is for: "...*USD1,993,000.00...together with interest and costs. Whereof the Plaintiff claims the said amount from the Defendant together with interest and costs...*"

5

29. Bronwen thus arranged for the arrest of the Vessel in respect of a claim for damages for an alleged breach of the charter party contract by Calais.

30. Although these proceedings in Nigeria have been commenced by "Bronwen ETL Nigeria," on information and belief there is no company with that name registered in Nigeria. Therefore, on information and belief, "Bronwen ETL Nigeria" is not a party to the charter party contract, and even if the company does exist it has no standing to make such a claim, other than, possibly, as agent for Defendant Bronwen. Calais reserves all its rights in respect of Bronwen's action in Nigeria.

31. Although the Vessel had discharged her cargo, she was held some distance from the berth by tugs and Calais continued to consider the berth unsafe. Therefore, Calais sought to shift the Vessel to anchorage on grounds of safety and to facilitate replenishment of bunkers and fresh water. Whilst the Vessel was under arrest, the Harbor Master refused to allow this movement.

32. Calais therefore sought the permission of the Nigerian Court to shift the Vessel, and this was granted on the basis that the original ship's papers were deposited with the Admiralty Marshall. This was done but the Harbor Master maintained his refusal to allow the Vessel to be shifted to anchorage.

33. The Harbor Master, despite the Order of the Court, refused to allow the Vessel to shift to anchorage unless the ship's original documents were deposited with him, notwithstanding that these were in the custody of the Admiralty Marshall, a fact confirmed to the Port Manager and Harbor Master in writing.

34. In addition to refusing to allow the Vessel to move from an unsafe berth where she was at risk and blocking port traffic, the Harbor Master refused to allow the Vessel to be

supplied with fresh water and fuel. The Vessel ran perilously low on fresh water before the Harbor Master relented and allowed these necessary supplies on board.

35.    Following unsuccessful attempts to persuade the Harbor Master to obey the Court Order to shift the Vessel, Calais' Nigerian lawyers issued contempt proceedings against the Harbor Master and against the port authorities who had also refused to obey the Order. The Vessel was only then allowed to shift to anchorage as the Harbor Master sought to purge his contempt under threat of penal sanctions.

36.    The Vessel is presently at anchorage in Nigeria.

37.    In order to release the Vessel from arrest in Nigeria, Calais, through its managers Capital, wrote to Bronwen with draft terms of a bank guarantee for $1,993,000.00 to be provided. The draft terms provided that the bank guarantee would answer a final and unappealable London arbitration award or, in the event of an appeal, a judgment of the High Court.

38.    Calais's solicitors then sent to Bronwen's solicitors a draft of the HSBC Bank guarantee offered as security for Bronwen's claims against Calais.

39.    On information and belief, as is the case in most arrest jurisdictions, the Nigerian Vessel arrest order contemplates that the parties can agree on the terms of security whereby the arrest can be lifted. Once an arrest order has been granted by the Nigerian court against a vessel, the court has the power to release the vessel either upon provision of a security demanded or *"until the court otherwise orders"* which means that another form of security may be accepted by the arresting party or imposed on them. These other forms of security commonly include a letter of undertaking issued by a P&I Club which is a member of the International Group of P & I Clubs, or a foreign Bank Guarantee such as HSBC Bank or Royal Bank of Scotland. It is also

not uncommon that parties may agree to accept the provision of a Bank Guarantee or cash security deposit in London notwithstanding the order of arrest in Nigeria.

40. On information and belief, if the contractually agreed forum for disputes is in another jurisdiction, once security is provided to satisfy an award or judgment in that other jurisdiction, the arresting party can then discontinue the Nigerian proceedings and proceed with the matter in the agreed jurisdiction or apply to stay the Nigerian proceedings (the latter in circumstances whereby the security is put up in Nigeria, perhaps in the form of a guarantee from a Nigerian bank, but the substantive proceedings are being determined in a foreign jurisdiction).

41. On information and belief, if Calais were to provide security that was addressed to the Nigerian court, there is a likely prospect of the Nigerian court assuming jurisdiction over the claims and instead, to avoid that prospect, the security should therefore be addressed directly to the arresting party, Bronwen, as is customary in most maritime jurisdictions.

42. Bronwen refused to accept the bank guarantee offered by Calais and instead, in breach of the charter party law and jurisdiction clause, Bronwen insisted that in order to obtain the release of the Vessel Calais had to provide security to the Nigerian court issued by a first class Nigerian bank and to submit to the dispute to the jurisdiction of the Nigerian court.

43. On November 13, 2007, Calais then offered to provide Bronwen with *cash* security in a London based escrow account to secure Bronwen's claims in the arbitration.

44. Bronwen continued its refusal to accept any security from Calais in order to release the Vessel from arrest and continued to wrongfully demand that its claims under the charter party contract be determined before the Federal Court of Nigeria at Lagos and that any such security be provided to the Nigerian court.

45. Notwithstanding that Calais has been ready, willing and able to provide security to the reasonable satisfaction of Bronwen since November 5, 2007, the Vessel remains wrongfully detained under arrest at Lagos.

46. Defendant, Bronwen, has wrongfully, in bad faith and with malice toward Calais refused to accept security for its claims and refused to otherwise arrange for release of the Vessel from arrest in Nigeria for the sole purpose of causing damage to Calais.

47. Bronwen's actions as alleged herein constitute wrongful arrest, detention and deprivation of the Vessel.

48. Presently the vessel cannot be traded in the market since there is no indication as to when the Vessel will be restored to Calais's possession and control. The loss to Calais for this detention, calculated at the demurrage rate set forth in the charter party contract is about $20,000 per day (net of commission), and therefore already amounts to a loss of over $300,000 and Plaintiff estimates that obtaining release of the Vessel through the Nigerian legal process may take a total of 100 days from November 4. This loss will therefore total $2,000,000.

49. In addition, as a further result of Defendant's wrongful arrest of the Vessel, Plaintiff has incurred damages in respect of legal costs in Nigeria relating to securing the release of the Vessel from the wrongful arrest - $10,600 to date.

50. Plaintiff, Calais, has sought and obtained an injunction order in London, England from the High Court of Justice, Queen's Bench Division Commercial Court enjoining Bronwen from continuing with the action before the Nigerian court and contending that Calais must provide security to the Nigerian court as opposed to the customary security offered by Calais.

51. In obtaining the Injunction Order from the High Court of Justice in London, Calais incurred legal costs. The costs of obtaining the injunction and of pursuing arbitration in London are estimated at $300,000.

52. As a further result of Defendant Bronwen's wrongful acts as alleged herein, if they are required to put in place a bank guarantee, Plaintiff, Calais, will incur costs in the sum of $168,000.00 relating to the differential of maintaining a bank guarantee to procure the release of the ship in Nigeria, by comparison with cash security, which has been offered by Calais to Bronwen.

53. In addition, on the basis that the arbitration agreement has been breached and in breach of the terms of the Order of the English High Court of Justice, in the event that the Charterers intend to pursue their claim on the merits there, the Owners have a claim in London arbitration in respect of any further costs that they are forced to incur in Nigeria dealing with the merits of the claim in Nigeria which are estimated in the amount of $290,000. Calais expects to incur further costs of approximately $20,000 in attempting to secure the release of the Vessel by application to the Nigerian Court. Should Bronwen wrongfully seek to pursue their claim on the merits in Nigeria, notwithstanding the terms of the charter party agreement, Plaintiff's Nigerian lawyers have estimated that costs of around $70,000 may be incurred at first instance. In addition, possible costs of up to $100,000 may be incurred in each of the two appellate courts (a total of up to $200,000).

54. Defendant also has failed and refused to pay or secure additional sums of demurrage due and owing to Calais under the charter party contract in the sum of $80,047.00.

55. Plaintiff has commenced arbitration proceedings against Defendants on its claim, but Defendant has failed and refused to proceed with the arbitration on its own claims and

instead has insisted on pursuing its claims in the Nigerian courts in breach of the charter party law and jurisdiction clause which provides for arbitration in London, England pursuant to English law.

56. Under English law, costs, including attorney's fees, arbitrator's fees, disbursements and interest are recoverable as an element of the Plaintiff's claim.

57. As best as can now be estimated, Plaintiff expects to recover the following amounts in the Final Arbitration Award(s):

| | | |
|---|---|---|
| A. | Principal claim: | $ 2,090,647.00 |
| B. | Interest for 3 year at 7.5% compounded quarterly: | $ 522,068.70 |
| C. | Estimated attorneys' fees and expenses: | $ 300,000.00 |
| D. | Estimated arbitration/legal costs in London: | $ 300,000.00 |
| **Total** | | **$ 3,212,715.70** |

58. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

59. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by

the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.   That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.   That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.   That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant in the amount **$3,212,715.70**calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.   That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court

E.   That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.   That this Court award Plaintiff its attorney's fees and costs of this action; and

    G.    That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: November 27, 2007
       New York, NY

                The Plaintiff,
                CALAIS SHIPHOLDING CO.

            By: _____
                Charles E. Murphy (CM 2125)
                Patrick F. Lennon (PL 2162)
                LENNON, MURPHY & LENNON, LLC
                The GrayBar Building
                420 Lexington Ave., Suite 300
                New York, NY 10170
                (212) 490-6050 – phone
                (212) 490-6070 – fax
                pfl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                       ) ss.: Southport
County of Fairfield )

1. My name is Charles E. Murphy.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     November 27, 2007
              New York, NY

                                                          _____
                                                          Charles E. Murphy